427 So.2d 705 (1983)
William Clyde CULBREATH and Virginia L. Culbreath
v.
Bobbie G. JOHNSON, Executrix of The Estate of Bessie W. Culbreath, Deceased.
No. 53608.
Supreme Court of Mississippi.
March 2, 1983.
Corr & Carlson, George C. Carlson, Jr., Batesville, for appellants.
Robert H. Broome, Batesville, for appellee.
Before WALKER, DAN M. LEE and ROBERTSON, JJ.
*706 ROBERTSON, Justice, for the Court:

I.
On June 7, 1975, Bessie W. Culbreath, the testatrix here, executed her holographic last will and testament leaving "all my land" to her granddaughter, Lynn Culbreath Schell. Almost four and a half years later, on November 21, 1979, a purported deed was filed for record wherein testatrix conveyed approximately 35 acres of land in Panola County, Mississippi, to her son, William Clyde Culbreath (the father of Lynn Culbreath Schell) and his second wife, Virginia L. Culbreath, defendants below and appellants here. On December 15, 1979, three weeks later, Bessie W. Culbreath died.
On April 10, 1980, Bobbie G. Johnson, the ex-wife of William Clyde Culbreath and the mother of Lynn Culbreath Schell, was appointed administratrix c.t.a. In that capacity on September 24, 1980, she brought this action in the Chancery Court of the Second Judicial District of Panola County. She charged that the signature of Bessie W. Culbreath on the purported deed was a forgery. The complaint prayed that the deed be declared null and void and cancelled of record.
After plenary trial on the merits, the Chancery Court found as a fact that the signature on the deed in question was not that of Bessie W. Culbreath but rather was a forgery. A final decree in favor of administratrix c.t.a. was rendered. William Clyde Culbreath and Virginia L. Culbreath have timely perfected their appeal to this Court, assigning as error only that the evidence at trial had failed to establish by clear and convincing evidence that the deed was a forgery. For the reasons set forth below, the decree below must be affirmed.

II.
The chronicle begins in 1952 when William Clyde Culbreath and Bobbie G. Culbreath Johnson, administratrix c.t.a. and appellee here, were married. One child was born to the marriage, namely, Lynn Culbreath, now Lynn Culbreath Schell. At sometime in 1960 Culbreath and his first wife were divorced. In November of 1964, Culbreath married his present wife, Virginia L. Culbreath.
On June 7, 1975, Bessie W. Culbreath, the mother of William Clyde Culbreath, wrote out her last will and testament which simply stated "I leave all my land and my diamond ring to my granddaughter, Lynn Schell." Without dispute this was and is the true holographic last will and testament of Bessie W. Culbreath.
At one time during her lifetime, the testatrix owned approximately 96 acres of land in Panola County. She had by prior conveyance alienated a portion of this land, so that in October of 1979 she owned approximately 35 acres.
In the fall of 1979, the testatrix was suffering from terminal cancer. At that time she was living in the home of her son and daughter-in-law, defendants below and appellants here, in Jacksonville, Arkansas. In October of 1979, all three Culbreaths, the two appellants here and the testatrix, visited Earl Otis Linebarier, Jr., a neighbor and lawyer, in the front yard of his home. They asked Linebarier if he would prepare the deed disputed in this action. They furnished him the legal description and other necessary information. On or about October 24, 1979, Linebarier delivered to the Culbreath home in Arkansas the deed he had prepared.
There is an unimportant conflict in the testimony regarding Linebarier's role in the execution of the deed. The Culbreaths testified that Linebarier brought the deed to their home with the notary seal already affixed and that Linebarier simply waited in the front room while the deed was taken to testatrix for her signature. Linebarier remembers that he merely left the deed at the Culbreath home and that the same afternoon or the next day it was returned to him signed but not notarized. He states that he then took the deed to Pine Bluff where it was notarized by his secretary. Of greater significance is the uncontradicted evidence
(a) that Linebarier did not see testatrix sign the deed, and
*707 (b) that the deed was not signed in the presence of the notary public.
Administratrix c.t.a. at trial relied primarily upon the testimony of Marie B. Hill, a handwriting expert. Ms. Hill gave her firm opinion that the signature on the deed was not that of testatrix. Comparing the signature on the deed to acknowledged samples of the actual signature of Bessie W. Culbreath, Ms. Hill explained that the deed had been forged, noting
(a) that the signature on the deed was compressed and much smaller than the true signatures of testatrix;
(b) that there were different slants in the letters when the deed was compared with testatrix' true signature;
(c) that there were different spacings in the letters of the signature on the deed when compared with the samples;
(d) that the signature on the deed appeared "drawn" as opposed to having been freely written; and
(e) that the signature on the deed sits perfectly on the line whereas the signatures on the samples "bounce."
Beyond this administratrix c.t.a., as the former daughter-in-law of testatrix Bessie W. Culbreath, testified that she had been familiar with the signature of her former mother-in-law and that in her opinion the signature on the deed was a forgery.
The Culbreaths, defendants below and appellants here, countered with their purported individual eyewitness testimony. Virginia L. Culbreath testified that she personally witnessed testatrix' execution of the deed in the presence of her two sons, Ronald Gene Culbreath, age 12 and William Joseph Culbreath, age 14. The testimony of the two sons was far less positive, though each remembered a lawyer visiting their house with a "paper" that their grandmother signed.
The Culbreaths also made a substantial attack on the credibility of the expert witness testimony of Ms. Hill. Cross-examination established that there were more sophisticated techniques, e.g., ultra violet lights and microscopes, which are frequently employed by handwriting experts. When asked why these were pretermitted in the case at bar, Ms. Hill replied, "It was not done because it didn't have to. There are enough dissimilarities in this handwriting to prove to me without a doubt that it is not her signature without having to go to that expense."
Faced with these irreconcilable conflicts in the evidence, the Chancery Court found as a fact that the signature on the purported deed in question was not the signature of Bessie W. Culbreath. In addition to thus crediting the testimony of Ms. Hill, the chancellor observed that there was a "tremendous variance" between the signature on the challenged deed when compared with the admitted true samples of testatrix' signature. The court, therefore, held
[t]hat the complainant [administratrix c.t.a.] has proven by clear and convincing evidence that the deed of record in Deed Book L-4 at page 255 in the Batesville office of the Chancery Clerk of Panola County, Mississippi, is not in the handwriting of Bessie W. Culbreath and is a forgery; that said deed is invalid, void and of no effect and should be set aside.

III.

A.
Without doubt administratrix c.t.a. at trial was saddled with the burden of proving the fact of forgery by clear and convincing evidence. McMahon v. McMahon, 247 Miss. 822, 836, 157 So.2d 494 (1962). The trial court found that this burden had been met.
Under established principles regarding our scope of review, see Blakeney v. Blakeney, 244 So.2d 3 (Miss. 1971), we are charged with examining the entire record. In so doing, that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's finding of fact, must be accepted. Blakeney v. Blakeney, supra, 244 So.2d at 4. If *708 there is substantial evidence to support the findings made by the trier of fact, those findings must be affirmed here.
In Clark v. Lansford, 191 So.2d 123 (Miss. 1966), the Court faced a problem comparable to that here. In commenting upon the value of testimony by a handwriting expert, the Court in Clark stated
The testimony of a handwriting expert that a signature is not genuine, supported by circumstances of probative value, is sufficient to overcome the impeached testimony of a notarizing officer to the questioned document. If corroborated by other facts or circumstances, the testimony of a handwriting analyst, tending to show the signature on an instrument to be forged, is sufficient to overcome that of a notarizing officer who, as here, was substantially impeached and who had no independent recollection of the transaction. 191 So.2d at 125.
Here, of course, there is no testimony of a notarizing officer to be overcome. For without contradiction, the notarizing officer did not witness the signature on the deed. Beyond that, the testimony of administratrix c.t.a. was corroborative of the expert testimony of Marie B. Hill. No doubt important in the chancellor's mind was his own conclusion, after viewing and contrasting the signature on the deed with admitted samples of the true signature of Bessie W. Culbreath. He found a "tremendous variance".
To be sure, this case is troublesome. The decision below necessarily brands Virginia L. Culbreath a liar. Such decisions regrettably from time to time must be made, human nature being what it is.
Appellate courts regularly admonish themselves to give substantial deference to findings of fact made by the trier of fact. In a case such as this such admonitions are peculiarly appropriate. As a matter of common sense as well as common law, the fact finder surely must have the benefit of viewing the manner and demeanor of the witnesses. Even then unraveling and decreeing a just result is difficult. The trial court necessarily has an infinitely superior vantage point when compared with that of this Court, which has only a cold record to read.
Here, we accord great credit to the trial judge's findings on two points. First, we note the testimony of the handwriting expert. Clark appropriately advises that
The weight and conclusiveness of testimony by a handwriting expert depends upon the character, capacity, skill and opportunities for observation of the expert, and the cogency of the reasons given by him for his opinion. This is essentially a question for the trier of facts. 191 So.2d at 125.
We would only add that the trial judge in this case was in a far better position than are we to sense whether Hill knew what she was talking about and whether her opinion was credible.
Second, and perhaps even more difficult, is the matter of the credibility of the testimony of Virginia L. Culbreath and her two sons. The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.
Allowing the trial judge's findings of fact a substantial measure of finality or presumptive validity is the least imperfect way we have of peaceably settling disputes such as this. Were we to substitute our view of the facts for the chancellor's, one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings are made by the man on the scene. The one time in a hundred when we may be right and the trier of fact wrong cannot justify our disturbing the established practice regarding our scope of review.

B.
This case provides one important exception to what we have just said. The signature *709 on the purported deed and the acknowledged true samples of the signature of Bessie W. Culbreath are in evidence here. The exhibits reviewed by us are exactly the same as the exhibits reviewed by the chancellor. The chancellor's vantage point here is no different from that of this Court. We see what he saw, no more, no less. The rationale underlying what we have said above doesn't fit this type of evidence. It necessarily follows that we should and do have greater leeway when it comes to reviewing findings based purely on documentary exhibits (though institutional considerations still demand that we give substantial deference to the trial judge's conclusions).
Here, the chancellor's finding that a forgery had occurred was based upon a combined consideration of (a) the expert witness testimony of Marie B. Hill, (b) the other corroborating and suggestive lay evidence, e.g., the testimony of administratrix c.t.a. regarding her personal knowledge of the signature of Bessie W. Culbreath, the fact that the deed was not signed in the presence of the notary public, etc. and (c) the chancellor's personal conclusion that there was a "tremendous variance" between the true signature of the testatrix and the purported signature on the deed. Thus, the "we see what he saw" aspect of the evidence is substantially intertwined with that where the chancellor, the man on the scene, is the only person who may sensibly be charged with finding the facts. In this case we have been constrained by the scope of review described in part A above in our review of the finding of forgery in this case.
We would caution the triers of the fact in cases such as this that they should not act as handwriting experts  nor should we on appeal. But see Nichols v. Estate of Sauls, 250 Miss. 307, 318, 165 So.2d 352, 357 (1964). As was demonstrated in this case, holography is a recognized field of expertise, subject to mastery only by persons who have undergone extensive training and experience. Handwriting experts are qualified in our courts the same as any other witnesses seeking to give expert opinion testimony. Still, of course, it was appropriate for the chancellor to review the exhibits in question. And, in affirming the judgment below we have given not inconsiderable weight to the chancellor's conclusion that there was a "tremendous variance".
We have reviewed the documents ourselves, although no observation made nor opinion formed by any member of this Court has played any role in our decision to affirm, which rests on the grounds stated. Suffice it to say that our review of the documents hardly suggests that the chancellor reached an erroneous conclusion.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.